**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| Donald D. Benson, | ) | Civil Action No. 1:11-02621-JMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Savannah River Nuclear Solutions | ) | **ORDER AND OPINION** |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Donald D. Benson ("Plaintiff" or "Benson") filed this action against his former employer, Savannah River Nuclear Solutions LLC ("Defendant"), alleging reverse sex discrimination[1] and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17.  (ECF No. 1.)  Plaintiff also asserts state law claims for breach of contract and breach of the implied duty of good faith and fair dealing.  (Id.)  This matter is before the court on Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (ECF No. 31.)  Plaintiff opposes Defendant's motion, asserting that Defendant has failed to show that it is entitled to judgment as a matter of law on his claims.  (ECF No. 35.)

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, the matter was referred to United States Magistrate Judge Shiva V. Hodges for pre-trial handling.  On June 20, 2013, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court grant Defendant's motion in its entirety.  (ECF No. 40.)  Plaintiff filed objections to the Report and Recommendation asking the court to reject the Magistrate Judge's recommendation.

---

1. Plaintiff alleges sex discrimination.  However, as a male, Plaintiff is a member of a majority class. Where a member of the majority alleges he is being discriminated against in favor of a member of a minority class, his claim is one for reverse discrimination.  Youmans v. Manna, Inc., 33 F. Supp. 2d 462, 464 (D.S.C. 1998).

1

(ECF No. 47.)  For the reasons set forth below, the court adopts the Report and Recommendation of the Magistrate Judge and **GRANTS** Defendant's Fed. R. Civ. P. 56 motion for summary judgment as to Plaintiff's claims for reverse sex discrimination, retaliation, breach of contract, and breach of the implied duty of good faith and fair dealing.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The facts as viewed in the light most favorable to Plaintiff are discussed in the Report and Recommendation.  The court concludes, upon its own careful review of the record, that the Magistrate Judge's factual summation is accurate.  The court adopts this summary as its own, and will only reference facts pertinent to the analysis of Plaintiff's claims.

The Savannah River Site ("SRS") is a federal reservation located in south-central South Carolina, which is owned by the United States Department of Energy ("DOE") and serves as a location for conducting research and development; converting highly enriched uranium into materials suitable for use in commercial nuclear reactors; producing new tritium for national security; receiving and storing spent nuclear fuel from across the nation and around the world; consolidating the nation's plutonium and uranium; managing wastes; cleaning up and removing excess buildings; and remediating soil and groundwater.    SRNS, http://www.savannahrivernuclearsolutions.com/about/about_srs.htm & /about/location.htm (last visited Sept. 20, 2013).  SRS is managed and operated by Defendant pursuant to a contract with the DOE.  Id.

Plaintiff began his employment at SRS in 1985 as a general service operator when the facility was managed and operated by E.I. DuPont De Nemours and Company ("DuPont"). (ECF No. 31-2 at 4 (13:24-14:3) & 5 (16:25-17:11).)  Plaintiff worked as a general service operator until he was promoted into a laboratory technician position.  (Id. at 6 (18:14-23).)

When Westinghouse Savannah River Company ("WSRC") assumed operations and management of SRS from DuPont, Plaintiff remained employed as a laboratory technician. (Id. (19:3-23).) However, in 1986 or 1987, he was promoted to the position of senior laboratory technician. (Id.) In 2008, Defendant assumed operations of SRS and Plaintiff remained employed at SRS as a senior laboratory technician, until his termination in April 2010. (Id. at 7 (22:25-23:23).)

On the morning of March 11, 2010, Plaintiff walked past the lab housing the Thermal Ionization Mass Spectrometry Unit ("TIMS Unit")[2] and observed two managers, Janice Lawson ("Lawson") and Janice Cook ("Cook"), and a third person in the lab. (ECF No. 31-2 at 14 (52:7–17).) Because the laboratory was experiencing an outage with one of the chillers used to keep the air in the laboratory cool, Lawson, Cook, and an engineer were checking to see whether they would be able to use the TIMS Unit that day. (ECF No. 32-1 at 5 (13:10–14:3) & 6 (17:10–18:23).) During their inspection, Lawson and Cook did not notice any condensation present on the TIMS Unit. (ECF No. 31-6 at 8 (25:14–26:18); ECF No. 32-1 at 6 (20:2–6) & 7

_____

2. The TIMS Unit refers to two instruments: an older instrument called the MAT 261 and a newer unit called the Triton. (ECF No. 31-2 at 13 (49:3-6); ECF No. 31-5 at 3 (6:6-13).) The TIMS Unit is used to measure sample composition by taking an element such as uranium or plutonium and breaking it down into its isotopic distribution and then reporting that into a weight percentage. (ECF No. 31-5 at 3 (5:10-7:12).) The heat necessary to run measurements is generated by a magnet and chiller hoses circulate cool water through the magnet to control the temperature of the magnet. (ECF No. 31-5 at 4 (9:12-10:2); ECF No. 31-6 at 5 (14:22-15:13).) Differences in temperature and humidity inside the laboratory was known to cause condensation to form on the TIMS Unit. (ECF No. 31-5 at 8 (26:3-22); ECF No. 31-6 at 7 (24:6-23).) Defendant considered condensation to be a major problem because it could cause the TIMS Unit to rust or damage the computer boards located inside the TIMS Unit. (ECF No. 31-2 at 15 (56:24-57:6); ECF No. 31-6 at 7 (23:2-9).) In the event that condensation formed on the TIMS Unit, Defendant would not use the TIMS Unit to run samples. (ECF No. 31-6 at 11 (38:4-11).) Anytime condensation was present on the TIMS Unit, it typically formed on the hoses that ran from the chiller and on the surface of the magnet casing. (ECF No. 31-5 at 4 (9:12-10:5). Therefore, these areas would be inspected to determine if the machine could be operated. (Id.)

(24:3-5).)

Thereafter, Plaintiff received a call from his supervisor, Tom Frazier ("Frazier"), who called Plaintiff to ask him a question about the temperature and humidity operating limits for the TIMS Unit. (ECF No. 31-2 at 14 (53:5–21).) Plaintiff called a laboratory chemist, Sherold Johnson ("Johnson"), at home to obtain the information for Frazier. (Id. at 15 (55:7-15); ECF No. 31-5 at 2 (4:12-20).) During his conversation with Johnson, Plaintiff told her that he thought there might be an issue with condensation on the TIMS Unit, although he had not yet inspected the unit. (ECF No. 31-2 at 15 (55:16–56:12).) He also stated that he thought management was planning to use the unit. (ECF No. 31-5 at 5 (14:7–16).) Shortly thereafter, Plaintiff visited the lab and saw condensation on the magnet and the chiller coils. (ECF No. 31-2 at 15 (57:7–18).) After observing the condensation, Plaintiff informed Johnson, who told him to change the magnet setting and put down swipes (absorbent cotton pads). (Id. at 17 (65:20-21) & 18 (66:1-14).)

After talking to Plaintiff, Johnson paged Lawson and told her that Plaintiff had called earlier and said that management was going to operate the TIMS Unit with condensation on it. (ECF No. 31-5 at (15:7–21).) Lawson responded to Johnson, stating that condensation was not on the TIMS Unit, but Lawson agreed to go back into the lab with Plaintiff to investigate. (ECF No. 31-5 at 5 (15:7–24).) Lawson and Cook then went back into the lab and found liquid on the magnet of the TIMS Unit. (ECF No. 31-6 at 8 (26:19–27:5); ECF No. 32-1 at 9 (29:3–4).) They did not see any condensation on the chiller lines or anywhere else on the TIMS Unit. (ECF No. 31-6 at 8 (27:6–14).) Moreover, the liquid did not appear to form as condensation typically does on the TIMS Unit. (Id. at 10 (34:2-25) & 8 (25:1-24).) Instead, it appeared to them that

4

someone had intentionally placed the liquid on the TIMS Unit. (ECF No. 32-1 at 22 (81:17–82:12).) While Lawson and Cook were in the lab, Johnson again called Lawson. (ECF No. 31-5 at 6 (17:4–20:10).) Lawson was speaking with Johnson on the telephone when Plaintiff returned to the lab carrying swipes. (ECF No. 31-2 at 18 (67:24–68:1); ECF No. 31-5 at 6 (19:23–25); ECF No. 32-1 at 9 (29:3–8).) While Lawson was speaking with Johnson, Cook told Plaintiff that they had been in the lab earlier and condensation had not been present on the TIMS Unit. (ECF No. 31-2 at 18 (67:23-68:15).) Plaintiff replied that he had found the TIMS Unit in that state. (Id.) Lawson then told Plaintiff to leave the lab. (Id. at 18 (68:18–21).)

Lawson called Johnson again and told her that she was going to begin an investigation, as the moisture did not come from the conditions of the building. (ECF No. 31-5 at 6 (Dep. 18:5–13).) Lawson and Cook photographed the fluid on the instrument and proceeded to dry the fluid from the instrument so that it did not cause any damage to the TIMS Unit. (ECF No. 31-6 at 8 (27:15–28:22); ECF No. 32-1 at 8 (27:1-28:20), 16 (59:5–22), & 18 (68:16–19).) Lawson then contacted Defendant's Department of Human Resources to notify them of the TIMS Unit incident. (ECF No. 31-6 at 12 (41:11–20).) Plaintiff returned to the lab in the mid-afternoon (between 11:30 a.m. and 2:00 p.m.) and again observed condensation on the TIMS Unit. (ECF No. 31-2 at (70:20–71:9).)

Defendant's Department of Human Resources referred the TIMS Unit incident to Defendant's internal investigations office where the matter was subsequently investigated by Investigator Mark Austin ("Austin"). (ECF No. 31-3 at 2 (3:6–16) & 3 (6:19–7:4).) Austin began his investigation on March 11, 2010. (ECF No. 31-8 at 1 ¶ 3.)

On March 15, 2011, Plaintiff arranged a meeting with Defendant's vice president, Fred Dohse ("Dohse"), to discuss safety issues and the ongoing investigation into the TIMS Unit

incident. (ECF No. 31-2 at 22 (83:6–85:11) & 24 (92:23–24).) During their meeting, Plaintiff told Dohse that he felt that he was being singled out and accused of tampering with the TIMS Unit because he had raised issues regarding safety procedures in the past. (Id. at 22 (85:18–23) & 25 (95:14-96:17).) Plaintiff considered Dohse's conduct during the meeting as harassing because Dohse pounded on the desk and cursed while they talked. (Id. at 24 (90:17–23).)

In late March of 2010, Defendant made an internal online posting of two openings for first line manager ("FLM") positions in the laboratory. (ECF No. 32-2 at 3-6.) Plaintiff attempted to apply for the FLM openings through Defendant's competency based posting system, which system required him to create an account, enter into the system required information regarding qualifications and background, and upload a resume. (ECF No. 31-7 at 2 (4:2-25) & 3 (5:1-14).) After an applicant has successfully applied for a position, the applicant is then notified by email that Defendant has received the application. (Id. at 3 (5:23-6:13).) Plaintiff had two co-workers help him complete his application and he claims he received email confirmation that his application was completed successfully. (ECF No. 31-2 at 25 (97:6-22) & 26 (98:8-25).) Defendant's records show that Plaintiff accessed the competency based posting system, but failed to complete his application. (ECF No. 31-7 at 3 (6:10-7-14.) As a result, Defendant evaluated a total of nine applicants for the two FLM positions, excluding Plaintiff. (ECF No. 31-7 at 4 (10:11-15); ECF No. 32-2 at 82-90.) In June 2010, Defendant promoted Maurice Lee and Louise Mims into the two first line manager positions. (ECF No. 32-2 at 91, 92, 97, 98.)

On April 15, 2010, Defendant conducted a Constructive Discipline Panel Meeting ("CDPM") to determine the appropriate disciplinary response to the allegations that Plaintiff was

involved in the TIMS Unit incident.[3]   (ECF No. 31-2 at 93; ECF No. 32-1 at 25 (94:16-25).)

Austin produced a "Summary of Investigation" on April 19, 2010, ultimately concluding that the

fluid was not condensation and that it had been intentionally placed on the instrument by

Plaintiff.  (ECF No. 31-3 at 4 (9:20–10:17), 5 (13:16–14:18), & 7 (23:23-24:21); ECF No. 31-8

at 1 ¶ 4, 17-18.)  After the CDPM, Defendant terminated Plaintiff for tampering with equipment,

effective April 22, 2010.  (ECF No. 31-2 at 94 & 95.)

On January 21, 2011, Plaintiff filed a charge of discrimination with the South Carolina

Human Affairs Commission and the United States Equal Employment Opportunity Commission.

(ECF No. 31-2 at 96.)   In the charge of discrimination, Plaintiff asserted that he had been

discriminated against on the basis of his sex and retaliated against for his opposition to unlawful

employment practices.  (Id.)  After receiving notice of the right to sue, Plaintiff commenced this

action on September 29, 2011, alleging reverse sex discrimination, retaliation, breach of

contract, and breach of the implied duty of good faith and fair dealing.  (See ECF No. 1.)  On

February 14, 2012, Defendant answered the complaint, denying Plaintiff's allegations.  (ECF

No. 11.)  On October 11, 2012, Defendant moved for summary judgment pursuant to Fed. R.

Civ. P. 56 as to all of Plaintiff's claims.  (ECF No. 31.)  Plaintiff filed opposition to Defendant's

motion on November 19, 2012, to which Defendant filed a reply in support of the Rule 56

motion on November 29, 2012.  (ECF Nos. 35 & 38.)

On June 20, 2013, the Magistrate Judge issued the aforementioned recommendation that

the court grant Defendant's motion for summary judgment.   (ECF No. 40.)   Plaintiff filed

---

3. Defendant asserts that Plaintiff was provided with sufficient notice prior to the CDPM, but
Plaintiff denies this, claiming that he did not learn of the CDPM until a few hours before the
meeting. (ECF No. 31-2 at 31 (119:21-121:25), 32 (122:1-9), & 93; ECF No. 32-1 at 25 (95:1-25).)
Therefore, Plaintiff was not present at the CDPM when Austin presented his findings to the panel.
(ECF No. 31-3 at 7 (21:19-21).)

objections to the Magistrate Judge's Report and Recommendation on July 29, 2013, asking the court to deny Defendant's motion. (ECF No. 47.) On August 14, 2013, Defendant filed a response to Plaintiff's objections, requesting that the court overrule the objections and adopt the Report and Recommendation in its entirety, to which Plaintiff filed an additional reply to re-articulate his position. (ECF Nos. 48, 51.)

## II.    LEGAL STANDARD

A.    Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with this court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections are filed, and reviews those portions which are not objected to—including those portions to which only "general and conclusory" objections have been made—for clear error. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983); Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. See 28 U.S.C. § 636(b)(1).

B.    Summary Judgment Generally

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a

8

whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. See Latif v. The Cmty. Coll. of Baltimore, No. 08-2023, 2009 WL 4643890, at *2 (4th Cir. Dec. 9, 2009).

C.     Claims of Discrimination under Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can establish claims of discrimination under Title VII in one of two ways, either by directly showing that discrimination motivated the employment decision, or, as is more common, by relying on the

indirect, burden-shifting method set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), to establish a prima facie case of discrimination.  Where there is direct evidence of discrimination, the <u>McDonnell Douglas</u> burden-shifting framework does not apply.  <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 121 (1985).

To demonstrate a prima facie case of discrimination in a failure to promote context, a plaintiff must show that (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for that position; and (4) the defendant rejected his application under circumstances that give rise to an inference of unlawful discrimination.[4]  <u>Diamond v. Colonial Life & Acc. Ins. Co.</u>, 416 F.3d 310, 319 n.6 (4th Cir. 2005).  Pursuant to the burden-shifting framework, once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action.  <u>Merritt v. Old Dominion Freight</u>, 601 F.3d 289, 294 (4th Cir. 2010).

If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext."  <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253  (1981).  Though intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuasion that the defendant engaged in intentional discrimination remains at all times with the plaintiff.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000) .

---

4. In his objections, Plaintiff asserts that to establish a prima facie case of reverse discrimination, he must show the following: (1) some evidence that he was part of a protected group, that is some evidence that "but for" his gender he would have been treated differently; (2) that his job performance was satisfactory/that he applied for the promotion; (3) adverse employment action; and (4) similarly-situated employee outside his protected group received more favorable treatment. (ECF No. 47 at 19 (citing <u>White v. BFI Waste Servs., LLC.</u>, 375 F.3d 288, 295 (4th Cir. 2004)).) The court is persuaded that the standard stated in <u>Diamond</u> is more applicable in the context of a claim for discriminatory failure to promote.

10

D.    <u>Claims of Retaliation under Title VII</u>

Title VII also protects individuals from retaliation by making it unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).  "Protected activities fall into two distinct categories: participation or opposition . . . .  An employer may not retaliate against an employee [for] participating in an ongoing investigation or proceeding . . . nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace."  <u>Laughlin v. Metro. Washington Airports Auth.</u>, 149 F.3d 253, 259 (4th Cir. 1998).  As with a claim for discrimination, a plaintiff may offer direct evidence of retaliation or use the <u>McDonnell Douglas</u> proof scheme.  <u>Baqir v. Principi</u>, 434 F.3d 733, 747 (4th Cir. 2006).  To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity; (2) an adverse employment action was taken against him; and (3) there was a causal link between the protected activity and the adverse action.  <u>Laber v. Harvey</u>, 438 F.3d 404, 432 (4th Cir. 2006) (analyzing retaliation claims under the ADEA and Title VII simultaneously).

E.    <u>Breach of Contract</u>

In order to prevail on a breach of contract claim under South Carolina law, a plaintiff bears the burden of establishing the existence and terms of the contract, defendant's breach of one or more of the contractual terms, and damages resulting from the breach.  <u>Taylor v. Cummins Atl., Inc.</u>, 852 F. Supp. 1279, 1286 (D.S.C. 1994) (citing <u>Fuller v. E. Fire & Cas. Ins. Co.</u>, 124 S.E.2d 602, 610 (S.C. 1962)).  In an action asserting breach of contract based on a handbook or other statement of company policy, once an employer voluntarily publishes the

handbook or policy to its employees, the employer may be held liable for breach of contract if the employee can establish that the handbook, policy, or other similar material applies to the employee, sets out procedures binding on the employer, and does not contain a conspicuous and appropriate disclaimer. Grant v. Mount Vernon Mills, Inc., 634 S.E.2d 15, 20 (S.C. Ct. App. 2006).

F.    Breach of the Implied Duty of Good Faith and Fair Dealing

Under South Carolina law, there exists in every contract an implied covenant of good faith and fair dealing. Shelton v. Oscar Mayer Foods Corp., 459 S.E.2d 851, 857 (S.C. Ct. App. 1995) (citing Parker v. Byrd, 420 S.E.2d 850, 853 (S.C. 1992)). However, the implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim for breach of contract. RoTec Servs., Inc. v. Encompass Servs., Inc., 597 S.E.2d 881, 884 (S.C. 2004) (citing Boddie-Noell Props., Inc. v. 42 Magnolia P'ship, 544 S.E.2d 279, 285 (S.C. Ct. App. 2000)).

### III.    ANALYSIS

A.    Plaintiff's Claim of Reverse Sex Discrimination

Plaintiff alleges reverse sex discrimination as a result of Defendant's failure to promote him to an open FLM position.

   *1.    The Magistrate Judge's Report and Recommendation*

The Magistrate Judge failed to review the merit of Plaintiff's reverse sex discrimination claim and did not offer the court a recommendation in this regard.

   *2.    The Parties' Arguments Regarding the Magistrate Judge's Report and Recommendation*

In his objections to the Report and Recommendation, Plaintiff asserts that the Magistrate

Judge erred in limiting his Title VII claims to only retaliation.[5]  (ECF No. 47 at 4.)   In this

regard, Plaintiff contends that he has established a prima facie case of reverse sex discrimination

by showing that "[h]is two immediate superiors, [Janice Lawson and Janice Cook] both female,

did not want to promote [][him] but instead wanted to promote a lesser qualified female [Louise

Mims] into the [FLM] position."  (Id. at 2, 20-21.)  Plaintiff further contends that Lawson and

Cook created the allegation of the TIMS Unit sabotage so he "would be disqualified from the

promotion and instead they could promote their favored candidate, another female."  (Id. at 4,

20.)  Based on the evidence in support of the foregoing allegations, Plaintiff asserts that he has

proven a prima facie case of reverse sex discrimination.  (Id. at 21.)  Therefore, Plaintiff also

objects to the Magistrate Judge's failure to analyze "the critical issue of pretext" in the Report

and Recommendation.  (Id. at 1.)  In this regard, Plaintiff asserts that he has provided evidence

of specific conduct by Defendant that shows the grounds for its actions were a pretext and it was

motivated by discriminatory reasons.  (Id. at 21-24.)  Therefore, Plaintiff urges the court to not

adopt the Magistrate Judge's Report and Recommendation and deny Defendant's motion for

summary judgment.

       In responding to Plaintiff's objections to the Report and Recommendation, Defendant

generally argues that the court should disregard Plaintiff's objections because they were not

specific objections to particular conclusions in the Report and Recommendation.  (ECF No. 48 at

2-3 (citing Fed. R. Civ. P. 72).)   In specific regard to Plaintiff's claim for reverse sex

discrimination, Defendant argues that the court should not consider the claim because it was

raised for the first time in Plaintiff's objections to the Report and Recommendation.  (Id. at 5.)

---

5. The actual language used by Plaintiff stated that the Magistrate Judge "used an inappropriate
method of analyzing Benson's case under Title VII . . . in recommending that Benson failed to
establish a prima facie case of employment discrimination."  (ECF No. 47 at 1.)

Defendant further argues that, even if the merits of Plaintiff's reverse sex discrimination claim are considered, Plaintiff's prima facie case of reverse sex discrimination fails because Plaintiff cannot show that (1) he would have received the FLM promotion and would have not been terminated "but for" his gender; (2) his job performance was satisfactory; and (3) there were similarly situated female employees who, after an independent investigation, [] [were] found to have tampered with equipment and [] [were not] terminated . . . ." (Id. at 6-8.)  Therefore, because Plaintiff cannot establish a prima facie case of reverse sex discrimination, Defendant asserts that the Magistrate Judge was not required to analyze the issue of pretext.  (Id. at 9.) Based on the foregoing, Defendant requests that the court overrule Plaintiff's objections to the Report and Recommendation.

In a reply in support of his objections to the Report and Recommendation, Plaintiff reiterated his evidence in support of pretext.  (ECF No. 51 at 1-3.)  He also argued that his objections comply with the requirements of Fed. R. Civ. P. 72, his discrimination claim is properly before the court, and his evidence satisfies the requirements of a prima facie case of reverse sex discrimination.  (Id. at 4-7.)

   3.    *The Court's Review*

The court reviewed the complaint and found that Plaintiff satisfied the notice pleading requirements of Fed. R. Civ. P. 8(a) and the plausibility standard of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), regarding a claim for reverse sex discrimination.[6]  Upon review

6. The court finds support in the complaint for a sex discrimination claim based on the following allegations specifically pled by Plaintiff:  (1) "COMES NOW DONALD D. BENSON . . . and files this, his Original Complaint, . . . seeking to recover damages for violations of Title VII . . . ."; (2) "Benson's managers, all of whom were female, selected for the promotion another female who had less seniority and experience than Benson had and was otherwise less qualified for the position than Benson."; (3) "Benson's immediate managers denied him the promotion he was qualified for and awarded it to a lesser qualified female because of his sex . . . . "; and (4) "Within 300 days of his termination, Benson filed a timely charge of discrimination . . . [and] [i]n his charge Benson alleged

of the merits of Plaintiff's claim for discriminatory failure to promote in the light most favorable

to him, the court finds that Plaintiff can only establish the first three prongs of his prima facie

case.[7]   In this regard, the court finds that there is insufficient evidence to support a finding that

Defendant rejected Plaintiff's application for the open FLM positions under circumstances that

give rise to an inference of unlawful discrimination.   Specifically, the court is persuaded by the

evidence that Defendant did not reject Plaintiff's application in violation of Title VII because (1)

Plaintiff pled that Defendant had "a pattern and practice of promoting the best qualified

individuals into new positions"; (2) the two open FLM positions were posted and filled

simultaneously; (3) the applicant interview panel consisted of both male (Kenneth Cheecks,

Woodie Melton) and female (Lawson and Cook) members; (4) the FLM positions were awarded

to one male (Maurice Lee) and one female (Louise Mims); and (5) Plaintiff's qualifications do

not establish that he was more qualified than either Lee or Mims.  (See ECF Nos. 1 at 2 ¶ 6; ECF

No. 32-2 at 4-6, 92 & 98.)  Based upon the foregoing, Plaintiff has failed to demonstrate a prima

facie case of discriminatory failure to promote based on his sex in violation of Title VII.

---

he was discriminated against on account of his sex . . . ."  (ECF No. 1 at 1, 2 ¶ 7, 3 ¶ 9, 4 ¶ 17.)

7. The court found that Plaintiff satisfied the first prong requiring that he be a member of a protected class because Title VII prohibits discrimination against all groups, including majority groups (such as males) that have been historically favored.  McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279-280 (1976).  However, courts are split on whether a non-minority plaintiff is entitled to the same inference of discrimination as a minority plaintiff when he or she proves a prima facie case. The Sixth, Eighth and District of Columbia Circuits have held that a reverse discrimination plaintiff only raises an inference of impermissible racial discrimination when he satisfies the McDonnell Douglas prima facie test and also presents evidence of background circumstances to support the suspicion that the defendant discriminates against the majority group in question.  See Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67-68 (6th Cir. 1985); see also Donaghy v. Omaha, 933 F.2d 1448, 1458 (8th Cir. 1991); Lanphear v. Prokop, 703 F.2d 1311, 1315 (D.C. Cir. 1983). Although it was not done in this instance, this court has previously held a plaintiff to the more onerous standard by requiring him to establish that the defendant was among those unusual employers that discriminate against the majority.  See Youmans v. Manna, Inc., 33 F. Supp. 2d 462, 464 (D.S.C. 1998).  The Fourth Circuit has not issued a decision on this issue.

Therefore, Plaintiff's claim for reverse sex discrimination fails as a matter of law and summary judgment should be granted to Defendant on this claim.

B.     Plaintiff's Claim for Retaliation in Violation of Title VII

Plaintiff alleges that he engaged in acts protected by Title VII and Defendant retaliated against him by denying him a promotion and terminating his employment.

*1.     The Magistrate Judge's Report and Recommendation*

Upon her review, the Magistrate Judge recommended granting Defendant's motion for summary judgment regarding Plaintiff's retaliation claim.  The Magistrate Judge determined that Plaintiff was unable to establish a prima facie case of retaliation because he could not show that he engaged in any protected activity.  (ECF No 40 at 10.)  The Magistrate Judge found that "the only complaints made by Plaintiff were related to safety issues and "[c]omplaints about safety issues, without any relationship to the classes protected by Title VII, cannot objectively be considered opposition [or protected] activity."   (Id.)

*2.     The Parties' Arguments Regarding the Magistrate Judge's Report and Recommendation*

In his objections to the Report and Recommendation, Plaintiff failed to cite specific error in the Magistrate Judge's recommendation that Defendant should be granted summary judgment on Plaintiff's claim for retaliation.  As referenced above, Plaintiff focused his objection on the Magistrate Judge's failure to address his claim for discrimination.

In response to Plaintiff's objections to the Report and Recommendation, Defendant asserts that the Magistrate Judge correctly found that Plaintiff failed to establish that he engaged in any protected activity under Title VII or failed to identify any activity that he believed to be protected and, therefore, failed to establish a prima facie case of retaliation.  (ECF No. 48 at 4-5.)

*3.    The Court's Review*

Upon review of the evidence, the court finds that the Magistrate Judge correctly concluded that Plaintiff cannot establish a prima facie case of retaliation.  More specifically, Plaintiff failed to submit evidence that he engaged in Title VII protected activities.  Based upon the foregoing, Plaintiff's objection to the Report and Recommendation is without merit and summary judgment should be granted to Defendant on Plaintiff's claim for retaliation.

C.    Plaintiff's State Law Claims for Breach of Contract and Breach of the Implied Duty of Good Faith and Fair Dealing

In addition to his federal claims, Plaintiff also alleges that Defendant breached their contractual relationship, which relationship was created by a mandatory safety policy that required employees to report any significant variances with established procedures or practices. (ECF No. 40 at 11 (citing ECF No. 35 at 18-19).)  Plaintiff argues that these mandatory safety rules altered his at-will relationship, creating a contract of employment.  (ECF No. 47 at 18-19.)

*1.    The Magistrate Judge's Report and Recommendation*

In the Report and Recommendation, the Magistrate Judge determined that the record did not support the existence of an employment agreement between Plaintiff and Defendant based on a mandatory safety policy.  (ECF No. 40 at 11.)  Therefore, the Magistrate Judge recommended granting Defendant's motion for summary judgment on Plaintiff's claims for breach of contract and breach of the implied duty of good faith and fair dealing.  (Id.)

*2.    The Parties' Arguments Regarding the Magistrate Judge's Report and Recommendation*

Plaintiff objects to the Magistrate Judge's recommendation, merely asserting that the Magistrate Judge "failed to consider critical evidence which established genuine issues of material fact regarding those [state law] claims."  (ECF No. 47 at 2.)

17

In response to Plaintiff's objection, Defendant asserts that Plaintiff did not provide any support for his objection other than the preceding conclusory statement.  (ECF No. 48 at 10.)  As such, Defendant argues that the Magistrate Judge correctly found that Plaintiff's state law claims "rest entirely on a safety policy that is not in the record, . . . . "  (Id.)  Defendant further argues that "[w]ithout this evidence, the Magistrate Judge properly found that Benson cannot establish his state law claims and the [c]ourt should adopt the findings of the Report on this issue."  (Id.)

3.    *The Court's Review*

Upon review, the court concurs in the Magistrate Judge's conclusion that there is insufficient evidence in the record to support a finding that Defendant modified Plaintiff's at-will status through the issuance of a mandatory safety policy.  In this regard, the only evidence of the safety policy was Plaintiff's statements in his affidavit (citing ECF No. 35-1 at 5 ¶ 19) and Plaintiff's statements are not enough to establish that the safety policy gave rise to a promise, expectation, or benefit, which could support a contract.  See Nelson v. Charleston Cnty. Parks & Recreation Comm'n, 605 S.E.2d 744, 747 (S.C. Ct. App. 2004) ("an employer's written documents can alter the  relationship and create an implied employment contract, but only if the employer phrases the document's language in mandatory terms giving rise to a promise, an expectation and a benefit to an employee."); see also Hessenthaler v. Tri-Cnty. Sister Help, Inc., 616 S.E.2d 694, 698 (S.C. 2005) (mandatory discipline procedures "typically provide that an employee may be fired only after certain steps are taken" and promise "specific treatment in specific situations").  Therefore, Plaintiff's objection to the Magistrate Judge's Report and Recommendation is without merit.  Accordingly, Plaintiff's claims based on a mandatory security policy for breach of contract and breach of the implied duty of good faith and fair dealing fail as a matter of law and summary judgment on these causes of action should be

18

granted to Defendant.

## IV.  CONCLUSION

Upon careful consideration of the entire record, the court adopts the Magistrate Judge's Report and Recommendation and incorporates it herein by reference.   The court hereby **GRANTS** Defendant's motion for summary judgment with respect to Plaintiff's claims for reverse sex discrimination in violation of Title VII, retaliation in violation of Title VII, breach of contract, and breach of the implied duty of good faith and fair dealing.  (ECF No. 31.)

**IT IS SO ORDERED**.


*J. Michelle Childs*

United States District Judge

September 20, 2013
Greenville, South Carolina